In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1708

KIMBERLY SPURLING,

*Plaintiff-Appellant,*

*v.*

C&M FINE PACK, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:11-cv-00039 — **Philip P. Simon**, *Chief Judge.*

ARGUED SEPTEMBER 23, 2013 — DECIDED JANUARY 13, 2014

Before BAUER, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* This appeal follows the district court's
entry of summary judgment in favor of C&M Fine Pack, Inc.,
("C&M") regarding its termination of Kimberly Spurling.
Spurling alleged that C&M discriminated against her in
violation of the Americans with Disabilities Act, as amended
("ADA"), as well as the Family and Medical Leave Act of 1993
("FMLA"). For the reasons set forth below, we affirm in part,
reverse in part, and remand for further proceedings.

## I. BACKGROUND

*A. Spurling's Employment at C&M*

Spurling began working for C&M in February 2004 as a Forming Inspector/Packer assigned to the third/night shift. In 2009, she began to exhibit a pattern of decreased consciousness and alertness, for which she received several disciplinary warnings. Spurling received a Final Warning/Suspension on February 15, 2010. On that date, Spurling left her work site to use the restroom and did not return for over twenty minutes. Spurling was later found sleeping in the restroom by a co-worker.

Following her suspension, Spurling met with plant manager Darrin Claussen and three of her supervisors. Claussen's meeting notes reflect that Spurling indicated that her sleep issues were caused by medication that her doctor had prescribed. She produced a note to the same effect, which stated, "Pt was recently asked to discontinue medicine related to her passing out—please excuse symptoms [at] work."

Spurling continued to experience difficulty remaining conscious while at work. On April 12, 2010, Jim Cardenas, Spurling's shift supervisor, reported her for being completely asleep while packing parts. He expressed concern for Spurling's safety and the lack of improvement in her wakefulness.

As a result of the continuing problem, Spurling attended a meeting with management personnel, who issued her a Final Warning/Suspension on April 15. The Final Warning/Suspension note stated:

> On 4/12/10 you were observed … with your head down at you[r] inspection station. To get your attention they had to yell your name at which time you snapped to and responded. This occurred several times during the shift … A review of your personnel file shows that in the last twelve months you have received three write-ups for performance and the last one a final warning with suspension for sleeping during your shift. Per our progressive discipline practice you have been suspended pending determination of the level of discipline you will receive for this latest incident. You were informed that you could face termination of employment per our progressive disciplinary practice. You were informed that I would be in touch no later than Monday, April 19[,] with [C&M]'s decision. You were also informed that if you had further information that was relevant to our deliberation, you needed to contact me prior to Monday.

Paul Bellant, the Human Resources Manager at C&M, testified that it was typical for C&M to wait almost two weeks for new information to be produced for consideration in whether to terminate an employee. On April 16, Spurling informed Bellant that her performance issues might be related to a medical condition. Bellant met with Spurling to provide her with a letter regarding the ADA and documentation for Spurling's physician to complete. The paperwork stated that it should be returned no later than April 30.

After Spurling received the paperwork, she alleges that she requested time off to determine the extent of her medical

issues. Bellant denies that Spurling ever requested time off, and insists that she was not eligible for FMLA leave as she was facing suspension pending termination of employment.

That same day, April 16, after giving the ADA paperwork to Spurling, Bellant emailed C&M's Vice President of Human Resources, Jeffrey Swoyer, concerning the action that C&M wanted to pursue regarding Spurling. Bellant's email recommended that C&M terminate Spurling, but conceded that in order to do so, Swoyer's authorization was required. The email acknowledges Bellant's communication with Spurling and states, "I have ADA paperwork that she will have her doctor fill out to begin the interactive process regarding her ability to perform … her job safely. I will put her on [leave of absence] until process is completed."

Spurling met with her physician, Dr. James Beitzel, on April 21. He filled out the ADA paperwork and marked "yes" by the box asking if the patient had a mental or physical disability covered under the ADA. Dr. Beitzel wrote that Spurling exhibited excessive drowsiness that affected her job performance and recommended periods of scheduled rest. Finally, he wrote "add'n medical work up in progress" at the bottom of the form.

Directly after her medical examination, Spurling took the paperwork to Bellant, who told her that he and Claussen would review the material and then send it to the corporate office for further review. Spurling alleges, and C&M disputes, that Bellant indicated that C&M would have an interactive meeting with her on April 26 to discuss her request for reasonable accommodations. No meeting occurred.

Regarding the import of Dr. Beitzel's examination, Bellant testified that the notation stating Spurling was suffering from a condition covered by the ADA was insufficient to establish that she had a disability. Likewise, Swoyer testified during his deposition, "I don't believe that the doctor is in a position to make that determination. It is his opinion." Instead of seeking clarification from Dr. Beitzel regarding Spurling's medical evaluation, C&M chose to proceed with her termination.

On April 28, Bellant emailed Swoyer his recommendation to terminate Spurling. He stated, "[W]e recommend the aggressive approach. Upon review of all the facts presented we feel that we did the interactive process during the progressive disciplinary process." Bellant acknowledged that while "there is an element of risk … we feel we did everything during the discipline process."

C&M proceeded with the termination of Spurling and informed her of its decision on April 28, 2010. On May 27, 2010, Spurling received a definitive diagnosis for narcolepsy, which in her case is manageable with proper medication.

*B. District Court Proceedings*

Spurling brought suit and made three claims under the ADA: disability discrimination, failure of the interactive process, and failure to provide reasonable accommodations.[1]

---

[1] Failure of the interactive process is not an independent basis for liability under the ADA. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). An employee must still show that she is a "qualified individual with a disability" and that a reasonable accommodation would have allowed her

(continued...)

She also claimed that C&M interfered with her rights under the FMLA.

The district court granted summary judgment in favor of C&M on both claims, holding that an employer could not be held accountable for discrimination under the ADA when both the employer and employee are unaware that a condition exists. The court stated that the central issue was one of causation; that is, whether Spurling suffered an adverse employment action as a result of her disability. It found that the termination took place on April 15, when Bellant's initial termination recommendation was made. The court found that C&M could not have discriminated against Spurling, as it had terminated her prior to having any knowledge of her condition.

For the same reason, Spurling's FMLA claim failed. The district court held that, since C&M was unaware of Spurling's qualifying condition, it could not be held liable for firing her because of that condition. The FMLA requires employer knowledge of the qualifying condition, which C&M did not have when it terminated Spurling on April 15.

---

[1] (...continued)

to perform the essential functions of her job. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Thus, "a plaintiff must allege that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Rehling v. City of Chi.*, 207 F.3d 1009, 1016 (7th Cir. 2000).

## II. ANALYSIS

Spurling challenges the district court's decision to grant C&M summary judgment on both her ADA and FMLA claims. Spurling argues that the district court erred in finding that April 15 was the effective date of her termination. She alleges that she was not actually fired until April 28, at which time C&M knew that she suffered from a disability covered under the ADA.

We review a grant of summary judgment *de novo*, and examine the record and all reasonable inferences in the light most favorable to the non-moving party. *Pagen v. TIN Inc.*, 695 F.3d 622, 624 (7th Cir. 2012). Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We will reverse a grant of summary judgment if a material issue of fact exists that would allow a reasonable jury to find in favor of the non-moving party. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

### A. ADA Claim

To establish a *prima facie* ADA claim, Spurling must show that: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002).

*1. Termination Date*

The district court relied on our holding in *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932–33 (7th Cir. 1995), to find that C&M did not have the requisite knowledge to fire Spurling "because of" her disability. Citing that case, the district court reasoned that an employer who fires an employee without knowledge of her disability relies on other, non-disability related, grounds. It determined that C&M fired Spurling on April 15 and found that C&M's lack of knowledge regarding Spurling's disability obviated the need to decide whether she was actually disabled.

The district court's reliance on *Hedberg* as analogous to this case is misplaced. *Hedberg* involved a restructuring of a company, in which layoffs and firings were inevitable and based on a neutral score given to employees. Hedberg received a poor score, which he attributed to his disability, but Hedberg's employers had no knowledge of his disability when they made their final decision to terminate his employment. *Hedberg* stands for the well-established principle that an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability. 29 C.F.R. app. § 1630.9 ("[A]n employer would not be expected to accommodate disabilities of which it is unaware."); *see also James v. Hyatt Regency Chi.*, 707 F.3d 775, 783 (7th Cir. 2013); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996); *Hedberg*, 47 F.3d at 932. But that is not the case here.

The actual issue in this case is whether Bellant's April 15 email sufficed to terminate Spurling. If it did, she was terminated before C&M knew of her disability. But if it did not,

C&M did not fire her until after learning of it. We have adopted an "unequivocal notice of termination" test to determine the date that an employee has been terminated. *Dvorak*, 289 F.3d at 486. It states that "termination occurs when the employer shows, by acts or words, clear intention to dispense with the employee's services." *Id*. There are two prongs to the test, both of which must be satisfied to fix the date of termination. "First, there must be a final, ultimate, non-tentative decision to terminate the employee … . Second, the employer must give the employee 'unequivocal' notice of its final termination decision." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004).

C&M's April 15 email may have begun the investigation into terminating Spurling, but it certainly did not manifest a clear intention to dispense with her services. Nor was the decision to terminate her ever communicated to her prior to April 28. Spurling was technically suspended pending a termination decision on April 15, not terminated outright. Indeed, Bellant informed Spurling that she could present new information that may be 'relevant to our deliberation,' which she did. After Spurling informed C&M that she might have a medical condition affecting her work, Bellant gave her ADA paperwork to be filled out by her doctor; it would seem as though C&M began to engage in the interactive process with Spurling. When C&M learned of her disability, however, it chose to take the "aggressive approach" and terminate her. This occurred on April 28, which is the date that her actual termination took place and when she received her unequivocal notice. Thus, Spurling was fired *after* C&M knew that she had a medical condition covered under the ADA.

*2. Failure to Accommodate*

Having determined that Spurling's termination was on April 28, we next turn to whether C&M properly accommodated Spurling after she notified them of her condition. We conclude that it did not. An employee begins the accommodation process by notifying her employer of her disability; "at that point, an employer's liability is triggered for failure to provide accommodations." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) (internal quotation marks omitted). After an employee has disclosed that she has a disability, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000)).

Rather than collaborate with Spurling or her doctor to find a reasonable accommodation, C&M chose to turn a blind eye and terminate her. It did not seek further clarification from either Spurling or her doctor and disregarded the medical evaluation altogether. This is hardly engaging with Spurling to determine if a reasonable accommodation could be made. *See Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281, 1286 (7th Cir. 1996) (employer should have sought an explanation from the doctor if it had concerns with the employee's medical diagnosis). And while an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable "if it prevents identification of an appropriate accommodation for a qualified individual." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). Accordingly, Spurling must show that a reasonable accommo-

dation could be made that would enable her to carry out the essential functions of her job. *Id.* The evidence suggests that a reasonable accommodation was readily available; Spurling simply needed further medical testing and a prescription to control her narcolepsy.

Once C&M received notice of Spurling's disability on April 21, it was incumbent upon them to determine, by engaging in an interactive process with Spurling, whether a reasonable accommodation could be made. *See Hedberg*, 47 F.3d at 934 ("[I]f an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer."). This process entails working with the disabled individual to produce a reasonable solution if one is available. 29 C.F.R. app. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

C&M never engaged in an interactive attempt to find a reasonable accommodation as claimed in the April 28 email from Bellant to Swoyer ("we feel that we did the interactive process during the progressive disciplinary process."). Spurling returned with C&M's ADA form, on which Dr. Beitzel indicated that she had a condition covered under the ADA. Despite this notation, C&M never contacted Dr. Beitzel to determine the severity of Spurling's ADA claim or how it might be able to provide a reasonable accommodation. Following a series of emails, it decided to terminate her,

despite the "element of risk." And, while it is true that Spurling presented the information to C&M after receiving her Suspension Pending Termination, she did so at C&M's behest. C&M properly began the interactive process as envisioned by the ADA, but failed to carry it through.

*B. FMLA Claim*

To establish her FMLA claim, Spurling must show: (1) she was eligible for FMLA protection; (2) C&M is covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave to C&M; and (5) C&M denied her FMLA benefits to which she was entitled. *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). For the purposes of this case, we are only concerned with the fourth element: whether Spurling provided sufficient notice to C&M regarding her "serious health condition." 29 C.F.R. § 825.100. If she did not, then C&M had no duty to grant her leave.

We first note that a "serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care … or continuing treatment by a health care provider[.]" 29 C.F.R. § 825.113(a). The latter phrase would likely qualify Spurling under the FMLA, so long as she alerted her employer to the seriousness of her health condition. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2012).

Spurling's statement to Bellant on April 16 (and prior to her medical evaluation), was simply that she needed time off to

figure out why she was falling asleep.[2] Given the circum-
stances of this case, this can hardly be deemed as notifying
C&M of a "serious health condition." An employee must
provide her employer with sufficient information to notify
them that she has a serious health condition that requires
FMLA protection. *See Stevenson v. Hyre Elec. Co.*, 505 F.3d 720,
725 (7th Cir. 2012). We cannot hold that the employer must
divine or investigate whether an employee has a condition
covered under the FMLA at any minor request for leave. We
have explicitly rejected that position, as the majority of leaves
requested by employees do not give rise to FMLA protections.
*Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 953 (7th Cir.
2004). To hold otherwise would "place a substantial and
largely wasted investigative burden on employers." *Id*.
Therefore, "unless the employer already knows that the
employee has an FMLA-authorized ground for leave, … the
employee must communicate the ground to him; he cannot just
demand leave." *Id*.

Spurling's remark to Bellant fails to meet this threshold. She
did not inform him that she had a "serious health condition"
nor did she have any personal knowledge of her own illness
that would allow her to put forth such information. Spurling
worked the night shift at C&M and many employees exhibited
sleeping issues during that shift, as Spurling conceded witness-

---

[2] While the parties dispute that Spurling made a statement regarding leave
from work, for the purposes of summary judgment we view the record in
the light most favorable to the non-movant. *Foley v. City of Lafayette*, 359
F.3d 925, 928 (7th Cir. 2004). Therefore, we accept Spurling's account of the
April 16 discussion.

ing while at work. Furthermore, Spurling had problems remaining awake in the past and had previously attributed the behavior to medication. Thus, Spurling's sleep issues were not something novel that would automatically alert an employer that something was amiss; sleeping on the job was a difficulty that many night shift employees endured and one that Spurling had already been disciplined for. *Cf. Byrne v. Avon Products, Inc.*, 328 F.3d 379, 380 (7th Cir. 2003) (drastic change in behavior of a model employee could suffice as proper notice of a serious medical condition under the FMLA). Spurling's vague assertion that she needed time off to determine why she was falling asleep was not sufficient to put C&M on notice that she had a serious medical condition that required FMLA leave.

### III. CONCLUSION

Spurling established disputed issues of material facts as to whether C&M failed to properly engage in the interactive process as required by the ADA, but did not provide sufficient notice to establish a claim under the FMLA. Accordingly, we AFFIRM the entry of summary judgment for C&M on the FMLA claim, REVERSE the entry of summary judgment in favor of C&M on Spurling's ADA claim and REMAND for further proceedings consistent with this opinion.